(Decided April 28, 1930.)

*Mr. Philip Sampliner,* for plaintiff in error.
*Messrs. Goldenbogen & Goss,* for defendant in error.

VICKERY, P. J. This cause comes into this court on a petition in error to the common pleas court of Cuyahoga county, in which court a judgment rendered in the municipal court of Lakewood, Ohio, in favor of the Commonwealth Oil Company, who was plaintiff in the municipal court of the city of Lakewood, was reversed, and the cause remanded to the municipal court, and it is to reverse that judgment of reversal that error is prosecuted here.

In order to understand and appreciate the ruling of the common pleas court, we must go back to the municipal court of Lakewood where the litigation was started, and in doing so we find from the record,

briefs, and arguments of counsel, that, prior to the bringing of the suit in the municipal court of Lakewood, a contract in writing had been entered into between plaintiff in error and the defendant in error, Harry E. Wiley, and that the plaintiff in error, the Commonwealth Oil Company, was engaged in dealing in gasoline station supplies and equipments, and in furnishing gasoline, and the contract referred to was to the effect that it would, on a lot of land described, enable the defendant below to establish a gasoline station, and, outside of the building and the land, would furnish the equipment to be used in the gasoline business thus to be inaugurated by the defendant below. Under that contract the plaintiff furnished the supplies upon an account for which this suit was originally brought, and in the court below it was admitted by the defendant below that he owed the amount of the bill for which suit was brought, but he claimed that he was not indebted to the plaintiff below because of a counterclaim which he had amounting to some eighteen or nineteen hundred dollars, which grew out of the contract under which the plaintiff below furnished the supplies.

The counterclaim in effect set up that the Commonwealth Oil Company, in order to encourage the defendant below to establish a gasoline station in close proximity to another gasoline station, to wit, in the same block in Lakewood—the other gasoline station being known as the Riverside Oil Company—entered into an agreement with Harry E. Wiley, who was to maintain and operate the gasoline station, to the effect that if he (Wiley) would buy his equipment from it, it would thereafter, for a period of

three years, furnish him with gasoline, and that he (Wiley) would buy all his gasoline from the Commonwealth Oil Company, who, to enable the said Wiley to operate a station at this place, agreed with him that it would sell him gasoline for the duration of the contract at a price six cents less than the price fixed by the Standard Oil Company. The contract, however, provided that during the year 1927 the guaranty was to be five cents a gallon only. In other words, if the Standard Oil Company's price was nineteen cents a gallon, the Commonwealth Oil Company agreed to furnish the gasoline to Wiley at fourteen cents a gallon for the year 1927, and thereafter the price which Wiley was to pay the Commonwealth Oil Company was to be based upon the price fixed by the Standard Oil Company in its stations, and the Commonwealth Oil Company was to sell gasoline to Wiley at six cents less than the Standard Oil Company's price.

Now, in order to further encourage Wiley to erect and carry on the business at this point, which was inviting competition, or rather going into competition with an established concern, to wit, the Riverside Oil Company, it was agreed between the Commonwealth Oil Company and Wiley that if for any reason the Riverside Oil Company, in order to drive out competition, should reduce its price on gas, then the Commonwealth Oil Company guaranteed in this contract to save Wiley from loss, or to protect him by reason of such competition.

The statement of defense setting up the counterclaim set this matter up, and then went on to state that the Riverside Oil Company did reduce the price of gas two cents a gallon, and Wiley, in order to meet

the competition, was compelled to reduce his price about two cents a gallon. I believe the exact reduction was to a price of six gallons for one dollar, which was a little more than two cents a gallon, but he claimed only two cents a gallon. He then goes on to assert in his statement of counterclaim, and in the opening statement of counsel, that during the time involved the price fixed by the Standard Oil Company was for a time nineteen cents a gallon, and then for a time was twenty cents a gallon, and that, inasmuch as Wiley was compelled to sell to meet the competition of the Riverside Oil Company, he sold at what he claimed to be a loss, and surely was a loss from the amount that the contract had guaranteed that he should receive or could receive on each gallon of gasoline that was sold, assuming, of course, that he would sell for the price established by the Standard Oil Company.

He further alleges that during this time he had purchased from the Commonwealth Oil Company 83,049 gallons of gasoline, and that, if he had sold this at the price fixed by the Standard Oil Company, instead of the price that he was compelled to sell to to meet competition of the Riverside Oil Company, he could have made approximately $1,900.

The statement of counsel to the court and jury was that the Standard Oil Company had fixed the price at nineteen and twenty cents per gallon, and the statement goes on to show that, while he admitted owing the plaintiff below the amount sued upon in its claim, after that amount was canceled by the larger amount due the defendant on his counterclaim, there would be the sum of something over $1,100, and that, inasmuch as the jurisdiction of the munici-

pal court of Lakewood was $1,000, he waived all sums over that, and asked for a judgment for $1,000 in his favor.

After this statement was made, and after the reading of the statement of defense, or the counter-claim, a motion was made to direct a verdict in favor of the plaintiff on the theory that the counterclaim did not properly set up a defense, and on the further ground that there was no claim that there was a *loss* to Wiley; that the guaranty that was attached to the counterclaim, which I have called a written contract, provided only against loss, and that there was no claim in the statement of counterclaim or in the opening statement of counsel that he lost anything; that at best he could only show that he did not make as much profit as anticipated; and it was argued and claimed that the guaranty was not against the losing of profits, but was against a loss, and, so far as appeared from the statement of counsel, and in the statement of defense by way of counterclaim, Wiley might still have made money even though he did not make as much profit as he anticipated he would make. In other words, the guaranty was not that he should make so much profit, but was against a loss.

After hearing the arguments of counsel upon this motion, the court granted the motion, and, inasmuch as the amount of the plaintiff's claim was admitted, less some amounts which were remitted from the claim by the plaintiff, the court entered up a judg-ment for the plaintiff below for the amount that was due it, ignoring entirely the counterclaim of the de-fendant. To this judgment error was prosecuted to the common pleas court, and, as already stated, the common pleas court reversed the judgment of the

municipal court and remanded the case for a new trial, and it is to reverse that judgment of reversal that error is prosecuted here.

Now several errors are urged in this court. The first is that there is no jurisdiction in this court to hear the matter, for the reason that there had been no jurisdiction in the court of common pleas to hear the case on error from the municipal court of the city of Lakewood; that, that court having no jurisdiction, its judgment was without force or effect, and therefore this court has no jurisdiction to review it. In other words, inasmuch as the error was prosecuted to a court which had no jurisdiction on error from the municipal court of Lakewood, properly there was no error prosecuted; consequently the judgment below should be affirmed, as rendered by the municipal court, or the cause should be remanded to the municipal court because error was not properly prosecuted from it.

We cannot accede to this doctrine. The argument is based upon the Constitution of Ohio, which created the Court of Appeals, that is, the Constitution of 1912. It provided that the Court of Appeals shall have jurisdiction in error from all courts of record in the state of Ohio inferior to said court, and, that being a constitutional provision, the Legislature could not by any act change the provision, for it must be remembered that the act of the Legislature in creating a municipal court of the city of Lakewood provided in so many words that error should be prosecuted from decisions of that court to the court of common pleas of Cuyahoga county (Section 1579-937, General Code), and, in pursuance with that provision of the act creating the municipal court of

Lakewood, error in the instant case was prosecuted by the aggrieved party to the common pleas court.

Now it is urged, as already stated, that that was wrong; that the Legislature could not interfere with the constitutional powers of the Court of Appeals to hear cases direct from courts of record. It is admitted in this case that the municipal court of Lakewood is a court of record, and it must be admitted that by the constitutional provision invoked litigants had the right to come direct to the Court of Appeals, and the Court of Appeals could not refuse to accept jurisdiction of the matter. The Constitution provides that the Court of Appeals shall have jurisdiction on error from all courts of record in the state inferior to it. The argument is made that this word "shall" gives the Court of Appeals *exclusive* jurisdiction, and to sustain this contention we are cited to the case of *Cincinnati Polyclinic* v. *Balch*, 92 Ohio St., 415, 111 N. E., 159.

An examination of that case, however, will not bear out the contention. The legislative act in that case sought to limit the jurisdiction of the Courts of Appeals in certain cases only after they had gone through the common pleas court, and, of course, that did interfere with the constitutional provision. The Legislature of Ohio could not say that the Court of Appeals would not have jurisdiction from a lower court of record unless error was first prosecuted to the common pleas court, because that would be in contravention of the constitutional provision relating to the jurisdiction on error direct from any court of record to the Court of Appeals. But it does not follow that, because the jurisdiction of the Court of Appeals can be invoked under the Constitution, the

Legislature can not provide that the common pleas court may also have jurisdiction on error proceedings from a lower court of record, or from a court that is not of record, for that matter. The jurisdiction of the common pleas court is unlike that of the Court of Appeals: it is fixed by statute, by legislative enactment; while that of the Court of Appeals, like that of the Supreme Court, is fixed by and governed by the Constitution. To illustrate: The Constitution of Ohio (Sections 2 and 6, Article IV) provides that the Supreme Court and Court of Appeals shall have original jurisdiction in *quo warranto,* mandamus, *habeas corpus,* prohibition, and *procedendo,* and nobody would for a moment deny that a litigant might bring a *habeas corpus* or a mandamus or even a prohibition proceeding in the common pleas court. We have nearly every day in this county cases that start in mandamus or *habeas corpus* in the common pleas court, from which error is prosecuted to this court, and the very fact that one must admit that one can bring a *habeas corpus* case in the common pleas court destroys the efficacy of the argument made by the learned counsel in this case when he says that, because the Constitution provides that the Court of Appeals *shall* have jurisdiction to hear error cases from any court of record, that excludes the prosecuting of error from a lower court of record to the court of common pleas.

Error proceedings can be prosecuted from a justice court to the common pleas court, and the justice court is not a court of record. There is a question whether a mayor's court is a court of record, but we need not determine that now; however, it has been held that mayor's courts are courts of record,

but surely parties in any lower court, inferior to the common pleas court, can prosecute error to the court of common pleas.

It is quite customary to prosecute error from the insolvency court to the common pleas court, and we have had a number of cases that have come into the Court of Appeals through that channel. In other words, the Court of Appeals receives its jurisdiction from the Constitution. The common pleas court receives its jurisdiction from the legislative enactments, and the litigant can go to either place, and, if he goes to the common pleas court, as he did in this case, he is in keeping with the act which created the municipal court of Lakewood. Or the litigant could have come direct to the Court of Appeals. It is a matter of election and selection by the litigant.

We have analyzed this proposition and made it plain because we think that the force of *Cincinnati Polyclinic* v. *Balch, supra,* has been misconceived.

After reviewing the authorities on this proposition, we are constrained to come to the conclusion that the plaintiff is wrong in his first assignment of error.

The next question is a little more difficult, but we think the court of common pleas was right in reversing this case for the reason that the municipal court did not hear evidence or permit the defendant below to offer evidence upon his counterclaim. There is a manifest latent ambiguity in that part of the contract which guarantees against a loss. Did that mean a financial loss within the ordinary meaning of the term, or did it mean a loss that would arise from the selling of gasoline at lower rates than the Standard Oil had fixed, brought about by the competition of

the Riverside Oil Company? Remember always that Wiley was induced by this contract to enter into competition with the Riverside Oil Company, and, before he would go into that competition, before he would establish a plant at this place, before he would agree to buy equipment from the Commonwealth Oil Company, he wanted to be assured that he would have a five or six cent margin on each gallon of gasoline that he handled; and the price that he was to pay after the first year, which guaranteed a specific amount, was to depend upon the selling price of gasoline established by the selling price of the Standard Oil Company; and under this contract he was to have a six-cent margin (except in 1927, in which the margin was to be five cents), based upon the prices fixed by the Standard Oil Company; that is, if the Standard Oil Company fixed nineteen cents, then he was to purchase and the Commonwealth Oil Company was to sell at 13 cents. If the Standard Oil Company raised the price to twenty cents, then he was to pay fourteen cents. If the Standard Oil Company raised to twenty-three cents, then he was to pay 17 cents—the price always gauged by the price fixed by the Standard Oil Company.

Now apparently what the parties had in mind in this contract was that, in order to enable the carrying on of business, the Commonwealth Oil Company would agree that there should always be a margin of five or six cents between the Standard Oil price and the price which the Commonwealth would charge Wiley for its product, and that this was necessary for the carrying on of the business and enabling Wiley to enter into competition.

So now when this contract was made and Wiley

was likely to be in competition with the Riverside Oil Company, it was agreed that whatever reduction the Riverside Oil Company made below that fixed by the Standard Oil Company would be assumed and taken care of by the Commonwealth Oil Company, the plaintiff below. At least that was the contention made in the counterclaim and by the statement of counsel.

Now, as already stated, there apparently is a latent ambiguity in this contract, and the court could only learn what that was by hearing the evidence upon the question, and when the court refused to hear evidence, or did not give the party an opportunity to produce the evidence in the case, and entered up judgment for the plaintiff on his claim, ignoring the counterclaim, the court without evidence put a construction upon a contract when, apparently, the parties had something else in mind; and the contract itself was not in evidence, but should have been, before the court could pass upon it, and the court had the right and it was the duty of the court to hear the evidence upon this question as to what the parties meant by this contract.

To illustrate by a case in contract: A binding machine was once sold to a farmer, and a guaranty made that the binding machine might be drawn by a team of horses. The question arose whether that meant a three-horse team or a two-horse team, and, in a suit upon the contract as to what the parties meant, the court received evidence, for the reason that the term a "team" of horses was ambiguous as used, and the court could only arrive at what the parties really meant by hearing evidence; and in that particular case the court did hear evidence and

found that what was contemplated was a team composed of three horses rather than of two horses.

Now what the parties meant by "team" was a matter of proof. And so in the instant case we think the court erred in directing a verdict or finding for the plaintiff on his claim, ignoring the defendant's counterclaim, which, if construed as he claims it should be construed, would give him a right to offset to the extent of the jurisdiction of the municipal court of Lakewood any claim that he might have against the plaintiff that grew out of this contract.

That apparently was the view which the court of common pleas took of this case, and we think the court of common pleas was right and therefore there is no error in this record, and the same will be affirmed. That means, of course, that the case will be remanded to the municipal court of Lakewood for further proceedings or a new trial.

*Judgment affirmed.*

SULLIVAN and LEVINE, JJ., concur.